# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**KAREN AEBERSOLD,**

       **Plaintiff,**

**v.**                                         **Case No:  6:18-cv-61-Orl-40DCI**

**UNITED OF OMAHA LIFE
INSURANCE COMPANY,**

       **Defendant.**

---

# REPORT AND RECOMMENDATION

    This cause comes before the Court for consideration without oral argument on the following motions:

| | |
|---|---|
| **MOTION:** | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 22)** |
| **FILED:** | **September 4, 2018** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 23)** |
| **FILED:** | **September 4, 2018** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

    This case stems from the denial of Plaintiff's claim for long term disability (LTD) benefits. Plaintiff claims that she is entitled to LTD benefits and filed this action to recover those benefits. Doc. 1.  The parties have each moved for summary judgment.  Docs. 22; 23.  Upon review, the undersigned finds that Defendant is entitled to summary judgment.

## I.      Background

Plaintiff worked as a "Design II Engineer" for Metal Master's Foodservice Equipment Co., Inc. (MMFE), and participated in MMFE's LTD benefits plan (the Plan), which was issued and administered by Defendant.  R. 249-50.  The Plan provides, in relevant part, as follows:

**AUTHORITY TO INTERPRET POLICY**

The Policyholder has delegated to [Defendant] the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the [Plan].  Benefits under the [Plan] will be paid only if [Defendant] decide[s], after exercising [its] discretion, that the Insured Person is entitled to them.  In making any decision, [Defendant] may rely on the accuracy and completeness of any information furnished by the Policyholder, an Insured Person or any other third parties.

. . .

**LONG-TERM DISABILITY DEFINITIONS**

**Disability and Disabled** mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

(a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

(b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

Disability is determined relative to Your ability or inability to work.  It is not determined by the availability of a suitable position with Your employer.

. . .

**Regular Occupation** means the occupation You are routinely performing when Your Disability begins.  Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). [Defendant has] the right to substitute or replace the DOT with a service or other information that [it] determine[s] of comparable purpose, with or without notice. To determine Your regular occupation, [Defendant] will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are

performed for a specific employer, at a specific location, or in a specific area or region.

R. 6, 46-47, 49.  The Plan provides for an LTD benefit of 60% of Plaintiff's basic monthly earnings less other income benefits.  R. 54.

On November 20, 2016, Plaintiff applied for LTD benefits (hereinafter, benefits) under the Plan.  R. 349-50.  In her application, Plaintiff claimed that as of June 24, 2016, she could no longer work because of "headaches, back pain, leg pain, nerve pain, [and] spasms," which, she claimed, limited her ability to sit, stand, and walk.  R. 249-50.

### A. Pre-Claim Medical Record

### 1. Physical Therapy

In January 2015, Plaintiff attended physical therapy due to complaints of neck and back pain, which reportedly worsened with prolonged sitting, heavy lifting, and yardwork.  R. 276. After several sessions of physical therapy, Plaintiff reported that her neck and back felt "about the same," but that her sleep and her ability to lift and sit had improved.  R. 281.  In late January 2015, Plaintiff discontinued physical therapy at the direction of her then-treating pain specialist, Dr. Ronald Lieberman.  R. 285.

### 2. Dr. Ronald Lieberman

On January 23, 2015, Plaintiff saw Dr. Lieberman.  During that visit, Plaintiff complained of back pain.[1]  R. 263.  Based on Plaintiff's complaints, Dr. Lieberman ordered an MRI of the lumbar spine, a diagnostic discography, and an EMG of the left lower extremity.  *Id*.

On February 3, 2015, Plaintiff underwent an MRI of her lumbar spine.  R. 299.  The MRI revealed a "[l]eft far lateral annular fissure at L4-L5 with shallow disc protrusion approaching, but

---

[1] According to the treatment note, this was a follow-up appointment.  R. 263.  It is not clear when Plaintiff began treating with Dr. Lieberman.

not contacting the exiting left L4 root," "[l]eft foraminal disc protrusion at L2-L3 with suspected mild left L2 nerve root encroachment," "[n]o spinal stenosis or cauda equina compression," and "[m]ild levoconvex lower lumbar scoliosis." *Id.*

On February 12, 2015, Plaintiff underwent a lumbar provocation discography, which revealed normal findings. R. 311-12.

On February 25, 2015, Plaintiff underwent an EMG evaluation. R. 202. The results of the EMG evaluation were "normal" and showed "no clear cut . . . evidence of lumbosacral radiculopathy in the left lower extremity." *Id.*

Plaintiff continued to treat with Dr. Lieberman through March 2015. During that time, Plaintiff complained of back, buttock, and left lower extremity pain. R. 264-65. To control Plaintiff's pain, Dr. Lieberman prescribed various medications and performed various minimally invasive procedures designed to control Plaintiff's pain. Specifically, on February 26, 2016, Plaintiff underwent a lumbar medial branch block, which reportedly resulted in greater than 80% post-procedure relief. R. 270. On March 3, 2015, Plaintiff underwent a second lumbar medial branch block, which reportedly resulted in 100% relief "during usual pain provoking motion." *Id.* The following day, however, Plaintiff reported that her pain was a 7 out of 10. R. 264. On March 10, 2015, Plaintiff underwent a lumbar transforaminal epidural steroid injection. R. 272-73. Plaintiff, however, reported that she experienced no relief following that procedure. R. 274. Thus, on March 24, 2015, Plaintiff underwent a second lumbar transforaminal epidural steroid injection. R. 274-75.[2]

---

[2] The record is silent as to whether Plaintiff experienced any relief following the second lumbar transforaminal epidural steroid injection.

Several days following the second lumbar transforaminal epidural steroid injection, on March 30, 2015, Plaintiff saw Dr. Lieberman for what appears to be the final time since the record contains no other records from Dr. Lieberman dated after March 30, 2015. R. 265. During that visit, Plaintiff reported that her pain had increased to an 8 out of 10. R. 265. Dr. Lieberman's final assessment included, in relevant part, "chronic pain syndrome," "neuropathic low back pain," and "lumbar radiculopathy of the left lower extremity in an S1 distribution." *Id*.

### 3. Dr. Kartik Swaminathan

In April 2015, Plaintiff began treating with Dr. Kartik Swaminathan, a physiatrist, due to ongoing neck and back pain. R. 250. Based on Plaintiff's complaints, Dr. Swaminathan ordered two MRIs of Plaintiff's cervical spine. R. 295. In addition, to control Plaintiff's pain, Dr. Swaminathan performed several injections to reduce Plaintiff's neck and back pain. R. 324-27.

On May 5, 2015, Plaintiff underwent the first MRI of her cervical spine. *Id*. The MRI revealed a "[m]inimal grade 1 listhesis at the C2-C3 level without significant internal disc derangement or significant stenosis" and "mild to moderate foraminal stenosis" with "no significant spinal stenosis at any level." R. 296.

Between May 2015 and October 2015, Dr. Swaminathan administered several injections to reduce Plaintiff's neck and back pain. R. 324-27.[3]

On February 3, 2016, Plaintiff underwent a second MRI of her cervical spine. R. 297. The findings were similar to those observed in the May 5, 2015 MRI of Plaintiff's cervical spine. *Id*.

Between March 2016 and April 2016, Dr. Swaminathan administered several SI joint injections and a lumbar transforaminal epidural steroid injection to reduce Plaintiff's back and

---

[3] The record is silent as to whether Plaintiff experienced any relief following these injections.

lower extremity pain.  R. 328-30.  Plaintiff subsequently reported to other treating physicians, that those injections offered "some benefit."  R. 336, 340, 534.

On July 29, 2016, Plaintiff saw Dr. Swaminathan.  R. 314-18.[4]  During that visit, Plaintiff reported that she continued to experience lower back and left lower extremity pain.  R. 314. Plaintiff also reported that sitting, lying down, pain medications, and the injections provided temporary relief from the pain, but that she continued to have difficulty sitting and standing for more than 30 minutes at a time.  *Id*.  During Dr. Swaminathan's physical examination, he observed muscle tenderness, pain, and restricted extension in the cervical spine, a positive straight leg raise test[5] on the left, a positive FABER test[6] on the left, a positive Gaenslen test[7] on the left, and pain and tenderness in Plaintiff's shoulders.  R. 317.  The rest of examination, however, was unremarkable.  R. 316-17.  Based on the evidence before him, Dr. Swaminathan assessed Claimant with low back pain, lumbosacral radiculitis, and sacroiliitis.  R. 317.[8]

---

[4] This is the first treatment note from Dr. Swaminathan in the record.

[5] The straight leg raise test is a "a physical examination technique to determine abnormality of the sciatic nerve or tightness of the hamstrings. The presence of sciatica is confirmed by sciatic nerve pain radiating down the limb when the supine person attempts to raise the straightened limb."  The Free  Dictionary,  https://medical-dictionary.thefreedictionary.com/straight-leg-raising+test  (last visited January 14, 2019).

[6] The FABER (or Patrick's test) is "[a] clinical test used to identify the source of pain (ilipsoas, groin or inguinal, or sacroiliac joint)."  The Free Dictionary, https://medical-dictionary.thefreedicti onary.com/FABER+test (last visited January 14, 2019).

[7] The Gaenslen test is "[a] procedure used to identify the presence of sacroiliac dysfunction."  The Free  Dictionary,  https://medical-dictionary.thefreedictionary.com/Gaenslen+test  (last  visited January 14, 2019).

[8] Plaintiff saw Dr. Swaminathan again in November 2016.  R. 319-23.  During that visit, Plaintiff complained of the same issues and Dr. Swaminathan's observations during the physical examination were the same as his July 29, 2016 findings.  *Id*.

On August 11, 2016, Plaintiff underwent an MRI of her lumbar spine.  R. 301.  The MRI revealed that the SI joints were unremarkable and that there were no other significant changes from the February 3, 2015 MRI of Plaintiff's lumbar spine.  R. 302.

On October 19, 2016, Dr. Swaminathan completed an assessment detailing Plaintiff's functional limitations.  R. 259-60.  In it, Dr. Swaminathan opined that Plaintiff can sit for no more than one and a half hours in an eight-hour workday and can stand and walk for no more than half an hour in an eight-hour workday.  R. 260.  In addition, Dr. Swaminathan opined that Plaintiff can lift no more than 10 pounds, can occasionally bend and reach above shoulder level, and cannot squat, crawl, or climb.  *Id*.  Finally, Dr. Swaminathan opined that Plaintiff could not work as of August 1, 2016.  R. 259.  Dr. Swaminathan's assessment, however, contained no explanation about how the medical evidence (e.g., diagnostic tests and examination findings) supported his opinions. *Id*.

### 4.  Dr. Adam Ginsberg

It appears that Plaintiff treated with Dr. Adam Ginsberg, D.O., between October 2015 and December 2015.  *See* R. 308-10, 313.  The record, however, does not contain any treatment notes from Dr. Ginsberg.  Instead, the record only contains evidence from the testing and referrals that Dr. Ginsberg ordered for Plaintiff.

In October 2015, Plaintiff underwent a bone scan of her lumbar spine and coccyx.  R. 308. The scan revealed "probable mild facet joint degeneration on the right side at L3-L4, but . . . [was] otherwise within normal limits."  *Id*.  The scan also revealed no coccygeal abnormalities.  *Id*.

That same month, Plaintiff attended physical therapy at the direction of Dr. Ginsberg.  R. 286.  During her first therapy session, Plaintiff reported that she could not sit, stand, or walk for more than 30 minutes at a time, and could not sleep for more than 6 hours at a time.  *Id*.  In

November 2015, Plaintiff reported that she experienced some improvement in her pain, but she subsequently reaggravated the pain after she performed some yardwork. R. 288. In December 2015, Plaintiff was discharged from physical therapy. R. 293. Upon discharge, Plaintiff reported that she experienced little relief in her lower back but experienced some improvement in her sacral area. *Id*. Plaintiff also reported that her sitting, standing, walking, and sleeping limitations remained unchanged. *Id*.

On December 14, 2015, Plaintiff underwent a lumbar discogram. R. 309-10. The procedure revealed "[d]egenerative L4/5 nucleogram with pressure not pain" and "[d]egenerative L3/4 and L5/S1 nucleogram with concordant 10/10 pain." *Id*.

That same day, Plaintiff underwent a cat scan of her lumbar spine. R. 313. The cat scan revealed "[g]rade IV degenerative annular tears at L3-L4, L4-L5 and L5-S1." *Id*.

### 5. Dr. Bruce Rudin

On December 21, 2015, Plaintiff saw Dr. Bruce Rudin, an orthopedic surgeon. R. 333. During that visit, Plaintiff complained of lower back pain, left posterior leg pain, and left foot numbness. *Id*. Dr. Rudin reviewed Plaintiff's December 14, 2015 lumbar discogram and diagnosed her with "[d]egeneration of lumbar or lumbosacral intervertebral disc." *Id*. Based on the evidence before him, Dr. Rudin stated that he did not believe that any reasonable practitioner would recommend back surgery based on the diagnostic findings. *Id*. Thus, Dr. Rudin discouraged Plaintiff from undergoing surgery. *Id*.

### 6. Ms. Nancy Lemoi, PA-C

In March 2016, Plaintiff saw Nancy Lemoi, PA-C, a rheumatology specialist, on two separate occasions. R. 350-53. During those visits, Plaintiff complained of neck and back pain

and reported that past lumbar epidural blocks had been unsuccessful.  *Id*.  Based on Plaintiff's complaints, Dr. Lemoi ordered an x-ray of Plaintiff's sacroiliac (SI) joints.  *See* R. 307.

That same month, Plaintiff underwent an x-ray of her SI joints.  *Id*.  The x-ray revealed an "[u]nremarkable radiographic appearance of the sacroiliac joints with no evidence of sacroiliitis."  *Id*.

### 7.  Dr. Robert Varipapa

It appears that Plaintiff treated with Dr. Robert Varipapa, a neurologist, between March 2016 and June 2016.  *See* R. 200-01, 305-06, 336-39.  During that time, Dr. Varipapa ordered an EMG and MRIs of Plaintiff's pelvis and thoracic spine.

On March 29, 2016, Plaintiff underwent an EMG test, which revealed peripheral neuropathy, "mild chronic L5/S1 radiculopathy on the left suggested," and "rule out sacroiliac joint disease."  R. 200-201.

On April 4, 2016, Plaintiff underwent an MRI of her pelvis.  306.  The MRI revealed edema within the inferior left SI joint.  *Id*.

On May 31, 2016, Plaintiff underwent an MRI of her thoracic spine.  R. 305.  The results of the MRI were normal.  *Id*.

On June 27, 2016, Plaintiff saw Dr. Varipapa.  R. 336-39.[9]  During this visit, Plaintiff complained of low back pain, paresthesia[10] in the legs, left leg pain, and neck pain.  R. 336.  Plaintiff reported that the pain is aggravated by prolonged sitting and standing.  *Id*.  Dr. Varipapa

---

[9] This is the only treatment note from Dr. Varipapa in the record.

[10] Paresthesia is defined as "[a] skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause."  The Free Dictionary, https://www.thefreedictionary.com/paresthesia (last visited January 14, 2019).

performed a physical examination, which was was largely unremarkable with the only abnormal observations relating to the apparent distress Plaintiff was in due to her back pain and Plaintiff's "stiff, careful gait."  R. 338.   Based on the evidence before him, Dr. Varipapa assessed Plaintiff with cervicalgia, lumbago, migraine, and paresthesias.  R. 339.

### 8.  Dr. Kennedy Yalmanchili

On June 8, 2016, Plaintiff saw Dr. Kennedy Yalmanchili, a neurologist, for a neurosurgical consultation.   R. 340-43.   During that visit, Plaintiff complained of "headaches, neck pain, radiating arm pain and numbness, midthoracic back pain, lower back pain, left hip pain, and pain radiating into the left leg."  R. 340.  Dr. Yalmanchili performed a physical examination of Plaintiff noting the following: mild cervical and lumbar spinal tenderness; pain over the SI joint; and positive Patrick's maneuver and hip thrust on the left leg.  R. 342.  The rest of the examination, however, was unremarkable.  *Id*.  While Dr. Yalmanchili stated that he does not believe that Plaintiff is a good candidate for surgical intervention, he nevertheless stated that "surgical fixation" of Plaintiff's SI joint "may be considered."  *Id*.

On August 17, 2016, Plaintiff saw Dr. Yalmanchili.  R. 344-47.  During that visit, Plaintiff complained that her back pain remained disabling.  R. 344.  Plaintiff's physical examination was unchanged from the previous examination performed by Dr. Yalmanchili.  R. 345.   Dr. Yalmanchili again stated that he does not believe that Plaintiff is a good candidate for surgery, but, nevertheless, offered to perform a "L3-4 and L5-S1 lumbar decompression."  R. 345-46.

Plaintiff elected to proceed with the surgery that Dr. Dr. Yalmanchili offered, but, in February 2017, Plaintiff's medical insurance denied coverage on the basis that it was not medically necessary.  R. 232-36.

### 9.  Dr. Deborah Kirk

Plaintiff saw Dr. Deborah Kirk, a family physician, on three separate occasions between June 2016 and December 2016.  R. 534-39.  Plaintiff routinely complained of back pain during these visits.  R. 534, 536, 538.  However, Dr. Kirk's physical examinations were unremarkable. *Id*.  Despite the unremarkable examinations, Dr. Kirk opined that Plaintiff's "pain level is too high to work."  R. 534.

### B.  Defendant's Review and Denial of Plaintiff's Claim for Benefits

Following Plaintiff's claim for benefits, in February 2017, Defendant sent a letter to Dr. Swaminathan.  R. 409-12.  In that letter, Defendant detailed the medical evidence it had in its possession and concluded that it did not support Plaintiff's claim for benefits.  R. 411.  Thus, Defendant asked Dr. Swaminathan to either sign the letter if he agreed with Defendant's evaluation of the evidence, or, if he disagreed, to send a response "with symptoms, physical exam findings, and diagnostic tests to support any restrictions . . . and limitations" that Plaintiff has because of her impairments.  R. 411.  Dr. Swaminathan did not respond to the letter.

In March 2017, Defendant obtained an occupational analysis of Plaintiff's job at MMFE. R. 379.  The consultant, a vocational and rehabilitation specialist, opined that Plaintiff's job at MMFE was comparable to that of a Mechanical-Design Engineer, Products, which, according to the DOT, involves "exerting up to 10 lbs. of force frequently," "a negligible amount of force frequently to lift, carry, push or otherwise move objects," frequent to constant sitting with intermittent standing/walking, and "near visual acuity and repetitive, bilateral fine finger and hand movements."  *Id*.

That same month, Defendant sent Plaintiff a letter denying her claim for benefits.  R. 135-39.  In that letter, Defendant detailed the medical evidence it had in its possession and concluded:

> [B]ased on the available medical documentation, examinations have consistently revealed normal strength, sensation, coordination and gait, with exception of notation on June 27, 2016[,] which noted stiff and careful gait.  Medical imaging and the EMG/NCV study did not reveal nerve root impingement or cord compression.  There is no medical documentation to substantiate a need for restrictions and limitations to preclude [Plaintiff] from the Regular Duties of her Own Occupation.  We do not have medical findings or documentation to support [Plaintiff's] claim.

R. 138.  Thus, Defendant found that Plaintiff did not qualify as disabled under the Plan and denied her claim for benefits.  *Id.*

### C. Post-Denial Medical Record

### 1. Dr. Defne Amado

On June 30, 2017, Plaintiff saw Dr. Amado, a neurologist, for a neurological evaluation.  R. 163-66.  Plaintiff reported, among other things, that she is unable to sit down due to her pain and has problems with her left leg, which, according to Plaintiff, have improved since she started taking Cymbalta.[11]  R. 163-64.  Dr. Amado performed a neurological examination, which was largely unremarkable.  R. 164.  Based on the evidence before her, Dr. Amado opined that Plaintiff's symptoms appear to be consistent with fibromyalgia and not neurologic in origin.  Nevertheless, Dr. Amado ordered an EMG of Plaintiff's lower extremities.  R. 165.

On July 20, 2017, Plaintiff underwent an EMG test of her lower extremities, which revealed "moderate common peroneal neuropathy distal to the innervation of the short head of the biceps femoris muscle."  R. 167.  Dr. Amado found that the EMG results were worth a surgical consultation, but that they did not evidence a "generalized polyneuropathy."  *Id.*  Instead, Dr.

---

[11] Cymbalta and its generic form, duloxetine, is used, in relevant part to, "help relieve nerve pain (peripheral neuropathy) in people with diabetes or ongoing pain due to medical conditions such as arthritis, chronic back pain, or fibromyalgia (a condition that causes widespread pain)."  WebMD, https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited Jan. 10, 2019).

Amado stated that she still believes Plaintiff's symptoms are "overall attributable to fibromyalgia." *Id*.

On September 5, 2017, Dr. Amado completed a fibromyalgia medical evaluation form. R. 119-126. In that form, Dr. Amado stated that Plaintiff suffers from fibromyalgia, severe headaches, nerve spasms, and nerve injury in the left leg. R. 119. Because of these impairments, Dr. Amado opined that Plaintiff can neither sit, stand, nor walk for more than 2 hours at a time, cannot tolerate prolonged sitting, and would need a job that allows her to shift positions at will. R. 123-24. Dr. Amado also opined that Plaintiff can occasionally lift less than 10 pounds but never lift more than 10 pounds, and she has some limitation in her ability to reach and handle. R. 124. Further, Dr. Amado opined that Plaintiff's pain would frequently interfere with her attention and concentration and that she would likely miss more than three days of work each month due to her impairments and treatments. R. 122, 125. Dr. Amado, however, provided practically no explanation about how the medical evidence (e.g., diagnostic tests and examination findings) supported her opinions. *See* R. 119-26.

That same day, Dr. Amado wrote a letter concerning Plaintiff's impairments and, in relevant part, noted that Plaintiff reported that she cannot sit for any length of time without extreme pain in her back, buttocks, and legs. R. 117-18. Further, Dr. Amado noted that Plaintiff reported that she is unable to work due to her fibromyalgia. R. 117. In that same letter, Dr. Amado opined that Plaintiff is unable to sit, stand, or walk for more than one hour at a time, is unable to perform her duties at MMFE, and qualifies for disability benefits due to her fibromyalgia. R. 118. Again, Dr. Amado provided practically no explanation about how the medical evidence (e.g., diagnostic tests and examination findings) supported her opinions. *See* R. 117-18.

**2. Dr. Rudin**

On July 27, 2017, Plaintiff saw Dr. Rudin.  During that visit, Plaintiff reported that she continued to suffer neck, back and left lower extremity pain and that her pain had worsened.  R. 334.  Based on the evidence before him, Dr. Rudin again concluded that Plaintiff was not a good candidate for surgery and, thus, declined to perform any surgery on her back.  *Id*.  Dr. Rudin's final assessment included "[d]egeneration of the lumbar or lumbosacral intervertebral disc" and "SI . . . joint dysfunction."  *Id*.

**3. Dr. Kirk**

On August 13, 2017, Dr. Kirk completed a form from the American College of Rheumatology designed to determine whether an individual suffers from fibromyalgia and, based on Plaintiff's reported symptoms, found that Plaintiff met the diagnostic criteria for fibromyalgia.  R. 158-60.

On August 14, 2017, Plaintiff saw Dr. Kirk.  R. 208.  During that visit, Dr. Kirk noted that Plaintiff reported "good improvement" on Cymbalta and that her physical examination was unremarkable.  *Id*.  Based on the evidence before her, Dr. Kirk assessed Plaintiff with fibromyalgia and "[d]egeneration of lumbar intervertebral disc."  *Id*.

That same day, Dr. Kirk completed a fibromyalgia medical evaluation form.  R. 151-57.  In that form, Dr. Kirk stated that Plaintiff meets the diagnostic criteria for fibromyalgia.  R. 151.  Because of this impairment, Dr. Kirk opined that Plaintiff can neither sit, stand, nor walk for more than 10 minutes at a time, cannot sit or stand for more than two hours in an eight-hour workday, and would need a job that allows her to shift positions at will every 15 minutes.  R. 154.  Dr. Kirk also opined that Plaintiff can rarely lift less than 10 pounds, can rarely stoop, crouch, crawl, kneel, and climb stairs, can occasionally bend, and has limitations in her ability to reach with her arms.

R. 155-56.  Further, Dr. Kirk opined that Plaintiff could tolerate low stress work, but would have difficulty with things such as short-term memory and adjusting to routine work changes.  R. 156.  Dr. Kirk, however, provided practically no explanation about how the medical evidence (e.g., diagnostic tests and examination findings) supported her opinions.  *See* R. 151-57.

On September 5, 2017, Dr. Kirk wrote a letter concerning Plaintiff's impairments and, in relevant part, noted that Plaintiff reported that she cannot sit for any length of time without extreme pain in her back, buttocks, and legs.  R. 206-07.  Further, Dr. Kirk noted that Plaintiff reported that she is unable to work due to her fibromyalgia.  R. 206.  In that same letter, Dr. Kirk opined that Plaintiff is unable to sit, stand, or walk for more than one hour at a time, is unable to perform her duties at MMFE, and qualifies for disability benefits due to her fibromyalgia.  R. 207.  Again, Dr. Kirk provided practically no explanation about how the medical evidence (e.g., diagnostic tests and examination findings) supported her opinions.  *See* R. 206-07.

### 4.  Dr. Swaminathan

On July 16, 2017, Plaintiff saw Dr. Swaminathan.  R. 180-84.  During that visit, Plaintiff reported that she continued to experience neck, back, and left lower extremity pain.  R. 180.  Plaintiff also reported that sitting, lying down, pain medications, and the injections provided temporary relief from the pain.  R. 182-83.  Dr. Swaminathan observations during the physical examination were the same as his July and November 2016 findings.  Based on the evidence before him, Dr. Swaminathan assessed Plaintiff with lumbosacral radiculitis, sacroiliitis, and chronic prescription opiate use.  R. 184.  Further, Dr. Swaminathan opined that Plaintiff is "[n]ot able to work due to pain."  R. 184.

On September 6, 2017, Dr. Swaminathan wrote a letter concerning Plaintiff's impairments and, in relevant part, noted that Plaintiff reported that she cannot sit for any length of time without

extreme pain in her back, buttocks, and legs.  R. 178-79.  Further, Dr. Swaminathan noted that Plaintiff reported that she is unable to work due to her fibromyalgia.  R. 178.  In that same letter, Dr. Swaminathan opined that Plaintiff is unable to sit, stand, or walk for more than one hour at a time, is unable to perform her duties at MMFE, and qualifies for disability benefits due to her fibromyalgia.  R. 179.[12]  Dr. Swaminathan, however, provided practically no explanation about how the medical evidence (e.g., diagnostic tests and examination findings) supported his opinions.  *See* R. 178-79.

### 5.  Ms. Lemoi

On August 17, 2017, Plaintiff saw Ms. Lemoi.  R. 175-177.  During that visit, Plaintiff reported that she continued to experience neck, back, and left lower extremity pain.  R. 175.  During Ms. Lemoi's physical examination, she observed SI joint tenderness, paraspinal myofascial tenderness throughout, diffuse myofascial tenderness in the shoulders, and tenderness in the hips.  R. 175-76.  The rest of examination, however, was unremarkable.  *Id*.  Based on the evidence before her, Ms. Lemoi assessed Plaintiff with fibromyalgia, low back pain, and cervicalgia.  R. 176.

That same day, Ms. Lemoi completed a fibromyalgia medical evaluation form.  R. 143-50. In that form, Ms. Lemoi stated that Plaintiff suffers from fibromyalgia and degenerative disc disease.  R. 143-44.  Ms. Lemoi's opinions concerning Plaintiff's impairments were identical to

---

[12] Based on the similarities in the letters purportedly authored by Drs. Kirk and Swaminathan in 2017, Defendant suggests that Plaintiff, in fact, authored those letters.  Doc. 22 at 14 n.16.  Even if the undersigned were to accept Defendant's position (the undersigned does not), the undersigned would nevertheless find that fact immaterial to the outcome of this case because each letter was signed by one of Plaintiff's physicians, who thereby adopted the opinions in the letter as their own. R. 178-79, 206-07.  Thus, for purposes of reviewing the motions for summary judgment, the undersigned presumes that the opinions contained in the letters signed by Drs. Kirk and Swaminathan are those physician's opinions.

Dr. Amado's opinions concerning Plaintiff's impairments.  *Compare* R. 121-26 *with* R. 145-50.[13]

Ms. Lemoi, like Dr. Amado, provided little explanation about how the medical evidence (e.g.,

diagnostic tests and examination findings) supported her opinions.  *See* R. 143-50.

On August 30, 2017, Ms. Lemoi wrote a letter concerning Plaintiff's impairments and, in

relevant part, opined that she is "unable to perform any activity or remain in one position for greater

than one hour without requiring rest for prolonged periods."  R. 174.  As a result, Ms. Lemoi

opined that Plaintiff is disabled and unable to perform her duties at MMFE.  *Id.*  Again, Ms. Lemoi

provided little explanation about how the medical evidence (e.g., diagnostic tests and examination

findings) supported her opinions.  *See* R. 174-75.

### D.  Plaintiff's Appeal and Defendant's Affirmance of its Denial

On September 7, 2017, Defendant received a letter from Plaintiff appealing the denial of

her claim for benefits.  R. 131-32.

In light of Plaintiff's appeal, Defendant retained Dr. Jacob Kogan, a neurologist, to perform

a medical record review.  R. 101-07.  In his October 9, 2017 report, Dr. Kogan noted that he

reviewed all the medical records submitted in support of Plaintiff's claim for benefits, including

the medical records submitted after Defendant's initial denial of Plaintiff's claim for benefits.  R.

101-03.  Based on his review of the medical records, Dr. Kogan stated that Plaintiff is clinically

asymptomatic, as demonstrated by Dr. Amado's physical examination observations, i.e., preserved

---

[13] Similar to the letters signed by Drs. Kirk and Swaminathan in 2017, Defendant contends that Plaintiff completed much of the fibromyalgia medical evaluation forms signed by Ms. Lemoi and Dr. Kirk.  Doc. 22 at 12 n.14, 13 n.15.  Again, even if the undersigned accepted Defendant's position (the undersigned does not), the undersigned would nevertheless find that fact immaterial to the outcome of this case because each form was signed by one of Plaintiff's physicians, who thereby adopted the opinions in the forms as their own.  R. 143-57.  Thus, for purposes of reviewing the motions for summary judgment, the undersigned presumes that the opinions contained in the forms signed by Ms. Lemoi and Dr. Kirk are those provider's opinions.

motor, sensory and reflex function in the left lower extremity.  R. 105.  Dr. Kogan also stated that

it appeared that fibromyalgia is Plaintiff's primary diagnosis and, thus, believed that issues relating

to that impairment would be more appropriately addressed by a rheumatologist.  R. 106.

Ultimately, Dr. Kogan opined that Plaintiff does not suffer any functional limitations due to her

neurological impairments.  R. 107.

In light of Dr. Kogan's review, Defendant retained Dr. Julia Ash, a rheumatologist, to

perform a medical record review.  R. 85-97.  In her October 25, 2017 report, Dr. Ash noted that

she reviewed all the medical records submitted in support of Plaintiff's claim for benefits,

including the medical records submitted after Defendant's initial denial of Plaintiff's claim for

benefits.  R. 85-92.  Based on her review of the medical records, Dr. Ash stated that the records

support diagnoses of "mild left sacroiliitis," fibromyalgia, and "[c]hronic disc disease/small disc

bulges at several levels of lumbar spine."  R. 94.  In light of these impairments, Dr. Ash opined

that Plaintiff would have the ability to do the following:

> [S]itting up to eight hours per day with five-minute breaks every two hours for
> stretching and rest.  Standing up to two hours per day.  Walking up to two hours
> per day [and] one hour at a time.  Lifting and carrying up to 10 pounds occasionally.
> Occasional pushing and pulling up to 100 pounds if weight is on wheels.
> Occasional climbing stairs.  Occasional driving.  Occasional reaching above and
> below desk level.  Frequent reaching at desk level.  Frequent fingering and
> grasping.  No kneeling, crouching and crawling.  No operation of heavy machinery.

R. 95.  In addition to opining on Plaintiff's limitations, Dr. Ash explained why Dr. Swaminathan's

opinions concerning Plaintiff's limitations were not supported by the medical record.  *Id*.  Further,

Dr. Ash noted that while Plaintiff claims that she is unable to perform simple activities of daily

living, the medical record, including Plaintiff's improvement on Cymbalta and the diagnostic

findings related to Plaintiff's neck and back impairments, "does not suggest pathology of such

degree as to support such functional limitations and therefore suggests some degree of symptom augmentation."  R. 96.

On November 1, 2017, Defendant sent Plaintiff a letter affirming its denial of her claim for benefits.  In doing so, Defendant provided the following explanation:

> The information provided to our office indicates you last worked at your sedentary occupation as a Mechanical Design Engineer on June 23, 2016, and you are claiming disability on June 24, 2016.  According to the Attending Physician's Statement completed by Dr. Kartik Swaminathan dated October 19, 2016, you were diagnosed with cervical radiculopathy, lumbar radiculopathy and sacrolitis.  On appeal, all the medical documentation was reviewed by a physician consultant, Dr. Julia Ash.
>
> After a complete review of your claim file Dr. Ash opined the medical records supported the diagnoses of mild left sacrolitis, fibromyalgia, and chronic lumbar disc disease.
>
> In regard to your lumbar disc disease, the medical records provided show you had a lumbar MRI on August 11, 2016, that revealed annular tears and small disc bulges at L2-, L3-4, and L4-5 with a close proximity to exiting left second and fourth nerve roots and right L3 root.  However, the MRI noted these findings were "stable and unchanged" from your lumbar MRI that was performed on February 3, 2015.  The EMG/nerve conduction findings performed on June 30, 2017, did not show solid evidence of lumbar radiculopathy at any level.  Further, the medical records from Dr. Amado document you had normal strength and gait, and you were able to normally heel-to-toe walk.
>
> The medical records also indicate you reported neck pain.  A cervical MRI revealed you have mild-to-moderate degenerative foraminal narrowing without nerve root compression or central canal stenosis.  The medical documentation does not provide detailed clinical findings regarding your neck condition.
>
> In addition, the medical records indicate your left-sided low back pain could be caused by left-sided sacrolitis.  We received diagnostic testing from 2015 and 2016 that showed you had mild edema in the left sacroiliac joint.  You received sacroiliac joint injections that did not provide improvement.  You were then treated with the medication meloxicam.  However, no new diagnostic testing has been received to confirm this diagnosis.
>
> Lastly, the medical records indicate you reported diffuse body pain with diffuse myofascial tenderness and multiple tender points that are consistent with fibromyalgia.  You were prescribed Cymbalta in June 2017, and the medical records indicate you reported improvement in your condition on Cymbalta.

Although you may have fibromyalgia as indicated in your appeal letter, and while we acknowledge you have symptoms of muscle and joint pain, the clinical records do not support any functional and/or cognitive impairment, due to this condition[ ], that would preclude you from working.  Fibromyalgia is a management condition that is treated with regular exercise, sleep restoration and possibly an antidepressant.

Depression is common with fibromyalgia.  However, the records do not substantiate any deficits in cognitive function, memory, or concentration.

Based on your multiple medical supported diagnoses and the medical findings, Dr. Ash concluded the medical records did support restrictions and limitations on your physical activities.  She provided the supported restrictions and limitations as follows: you would be able to sit for eight hours a day with five-minute breaks every two hours for stretching and rest; you have the ability to stand and walk for two hours, one hour at a time, each throughout an eight-hour day; lift and carry up to 10 pounds and push and pull up to 100 pounds with a wheeled cart; perform occasional driving, stair climbing, reaching above and below desk level; and perform frequent fingering, feeling and grasping.  Dr. Ash concluded you would not be able kneel, crouch, crawl or operate heavy machinery.

R. 78-79.  Thus, in light of the foregoing, Defendant again found that Plaintiff did not qualify as disabled under the Plan and affirmed its denial of her claim for benefits.  R. 79.

### E.  The Complaint and Motions for Summary Judgment

On January 11, 2018, Plaintiff filed a complaint against Defendant seeking to recover benefits under the Plan, which is covered by the Employee Retirement Income Security Act of 1974 ("ERISA").  Doc. 1-3.

On September 4, 2018, the parties filed cross-motions for summary judgment.  Docs. 22; 23.  In support of Defendant's motion for summary judgment, Defendant attached a declaration from one of its appeals specialists, Trisha Pellett, who described the procedure Defendant used to review Plaintiff's claim for benefits.  Doc. 22-1.

On October 4, 2018, the parties responded to the cross-motions for summary judgment.  Docs. 26; 28.  That same day, the parties also filed a stipulation of agreed material facts, in which

they stipulated to the following: 1) the final decision is subject to the arbitrary and capricious standard of review because Defendant had full discretion in determining whether Plaintiff was entitled to benefits under the Plan; and 2) the Court's review is limited to the administrative record and Ms. Pellett's declaration.  Doc. 27.

On October 15, 2018, Plaintiff filed a reply to Defendant's response to Plaintiff's motion for summary judgment.  Doc. 29.  Therefore, the matter is now ripe for review.

## II.    The Applicable Standards

### A.  Summary Judgment

An action challenging the denial of benefits under ERISA is subject to a unique six-step review.  *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354-56 (11th Cir. 2011) (setting forth the framework for analyzing an ERISA case involving the denial of benefits).  This unique review requires the district court to act more as an appellate tribunal than a trial court.  *Curran v. Kemper Nat. Servs., Inc.*, 2005 WL 894840, *7 (11th Cir. Mar. 16, 2005)[14] (citing *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)).  Thus, a motion for summary judgment filed in an ERISA action "is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)).  Therefore, the district court "does not take evidence" when considering a motion for summary judgment in an ERISA action, but it, instead, "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary," because the "pertinent question is not whether the

---

[14] In the Eleventh Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.

claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point." *Crume*, 417 F. Supp. 2d at 1272-73.

**B.  The ERISA Framework**

A plan participant may bring a civil action under ERISA "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). "A plaintiff suing under this provision bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

The ERISA statute "does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108-109 (1989). Thus, the Eleventh Circuit has developed the following multi-step framework to guide courts in reviewing an ERISA plan administrator's benefit decision:

1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.  The court's "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision."  *Id*. at 1354.

## III.   Analysis

Plaintiff argues that the decision to deny her claim for benefits was arbitrary and capricious because: 1) Defendant impermissibly cherry-picked evidence that supported denial; 2) Defendant erroneously relied on Drs. Kogan's and Ash's opinions; and 3) Defendant failed to obtain a vocational analysis.  Doc. 23 at 13-18.  Further, Plaintiff argues that the decision to deny her claim for benefits was also arbitrary and capricious because it was "likely motivated by a conflict of interest."  *Id*. at 13.  Thus, Plaintiff requests that the Court find Defendant's decision was arbitrary and capricious, enter summary judgment in Plaintiff's favor, and award her benefits under the Plan. *Id*. at 19.

Defendant argues that it provided a reasonable basis to deny Plaintiff's claim for benefits. Doc. 22 at 18-24.  Further, Defendant argues that any conflict of interest in its claims handling process did not "improperly influence[ ] or affect[ ] the claim decision and render it arbitrary and capricious."  *Id*. at 25.  Thus, Defendant requests that the Court enter summary judgment in its favor.  *Id*.

There is no need to determine whether Defendant's decision was *de novo* wrong, because Defendant provided a reasonable basis to deny Plaintiff's claim for benefits and Defendant's structural conflict of interest did not unreasonably taint Defendant's decision.  Therefore, the

undersigned finds that Defendant's decision was not arbitrary and capricious and, as a result, Defendant is entitled to summary judgment.

### A. The Denial of Benefits was not Arbitrary and Capricious

The parties acknowledge that Defendant was vested with discretion to determine whether Plaintiff was entitled to benefits under the Plan.  R. 6; Doc. 27.  Thus, each of the steps used to review a decision to deny benefits are "potentially at issue."  *Blankenship*, 644 F.3d at 1356 n.7.  That said, the parties' arguments essentially bypass consideration of whether Defendant's decision was "*de novo* wrong" and, instead, focus on whether Defendant's decision was arbitrary and capricious.  *See* Doc. 22 at 18-24; 23 at 13-18.  Therefore, the undersigned will begin the analysis by considering whether Defendant's decision was arbitrary and capricious.  *See, e.g.*, *Prelutsky v. Greater Ga. Life Ins. Co.*, 692 F. App'x 969, 973 (11th Cir. 2017) (bypassing the *de novo* right or wrong standard and proceeding directly to the arbitrary and capricious analysis); *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1287 n.19 (M.D. Fla. 2013) (similar).

"Under the arbitrary and capricious standard of review, the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'"  *Townsend v. Delta Family-Care Disability and Survivorship Plan*, 295 F. App'x 971, 976 (11th Cir. 2008) (quoting *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 912 (11th Cir. 1997) (internal quotations and brackets omitted)).  "As long as the decision had a reasonable basis, it 'must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary conclusion.'"  *Richey v. Hartford Life & Accident Ins. Co.*, 608 F. Supp. 2d 1306, 1310 (M.D. Fla. 2009) (quoting *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008)).  Even if the evidence is close, the Court

cannot overturn the administrator's decision when applying the requisite deference.  *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1363 (11th Cir. 2008).

In reviewing Plaintiff's claim for benefits, Defendant considered the medical evidence of record and even sought clarification from one of Plaintiff's treating physicians, Dr. Swaminathan (R. 409-412).  In its letter denying Plaintiff's claim for benefits, Defendant identified the evidence it reviewed and summarized much of that evidence, including Plaintiff's subjective complaints, diagnostic studies, and physical examination findings.  R. 135-38.  Ultimately, Defendant concluded that:

> [B]ased on the available medical documentation, examinations have consistently revealed normal strength, sensation, coordination and gait, with exception of notation on June 27, 2016[,] which noted stiff and careful gait.  Medical imaging and the EMG/NCV study did not reveal nerve root impingement or cord compression.  There is no medical documentation to substantiate a need for restrictions and limitations to preclude [Plaintiff] from the Regular Duties of her Own Occupation.  We do not have medical findings or documentation to support [Plaintiff's] claim.

R. 138.  Thus, Defendant found that Plaintiff did not qualify as disabled under the Plan and denied her claim for benefits.  *Id.*

Plaintiff appealed Defendant's denial and submitted additional medical and opinion evidence in support of her claim for benefits.  *See supra* pp. 12-16 (discussing medical and opinion evidence post-dating Defendant's initial denial of Plaintiff's claim for benefits).  In addition to the post-denial evidence provided by Plaintiff, Defendant also obtained reports from two non-examining physicians, Drs. Kogan and Ash, both of whom reviewed the evidence of record.  R. 85-97, 101-07.

In its letter affirming the denial of Plaintiff's claim for benefits, Defendant discussed Plaintiff's various impairments and why the record does not support her claim for benefits.  R. 71-

72.   Specifically, it appears that Defendant affirmed its denial of Plaintiff' claim for benefits for the following reasons:

- The objective evidence (e.g., diagnostic studies and physical examinations) did not support Plaintiff's claim of disability.

- Plaintiff's fibromyalgia was improved on Cymbalta.

- Dr. Ash's medical record review and opinions established that Plaintiff's impairments would not preclude her from performing the duties of her "regular occupation."

*Id*. Thus, for those reasons, Defendant affirmed its denial of Plaintiff's claim for benefits.   R. 72.

There were several reasonable bases for Defendant to deny Plaintiff's claim for benefits. Those reasons included: 1) diagnostic imaging of Plaintiff's lumbar spine showed that her lumbar disc disease remained "stable and unchanged;" 2) Plaintiff exhibited normal strength and gait during her physical examination with Dr. Amado;[15] 3) on more than one occasion Plaintiff reported that she had experienced improvement on Cymbalta (R. 163-64, 208); and 4) Dr. Ash's opinion that while Plaintiff's impairments caused limitations she nevertheless has the ability to perform sedentary work (R. 85-96).   There is no question that the record also contains contradictory evidence – such as the opinions from several of Plaintiff's treating physicians – that tend to support Plaintiff's claim for disability.   However, "a plan administrator is entitled to weigh the evidence and resolve conflicting evidence about the claimant's disability."   *Townsend*, 295 F. App'x at 977 (citing *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997)).   Here, Defendant resolved the conflicting evidence in favor of denying Plaintiff's claim for benefits.   The

---

[15] Plaintiff underwent other physical examinations that contained similar findings or did not otherwise show that Plaintiff's strength or her gait were diminished.   *See, e.g.*, R. 534, 536, 538. Further, some of those same examinations were unremarkable in other respects, such as normal range of motion in extremities (*see, e.g.*, R. 175, 317) and normal reflexes (*see, e.g.*, R. 175, 317, 338, 538).

undersigned cannot say that the Defendant's resolution of the conflicting evidence, particularly the conflicting opinion evidence, was unreasonable.  *See Blankenship*, 644 F.3d at 1356 (concluding that administrator did not act unreasonably in relying on file reviews from independent doctors instead of in-person, physical examinations of the claimant).   Thus, since there were reasonable bases for Defendant to deny Plaintiff's claim for benefits, the undersigned finds that Defendant's decision is not arbitrary and capricious.

### 1.   Defendant did not Conduct a Selective Review of the Record

Plaintiff argues that Defendant "side stepped the evidence supporting disability by engaging in a pattern of selectively interpreting the contents of Plaintiff's medical file and 'cherry-picking' snippets of the Plaintiff's medical records in an effort th[at] support[ed] the denial." Doc. 23 at 13.  In support, Plaintiff points to Defendant's summary of the medical evidence.  *Id*. at 13-16.  Plaintiff contends that Defendant's summary omits information that tends to support Plaintiff's claim for disability.  *Id*.  As a result, Plaintiff argues that Defendant engaged in a selective review of the record and, as a result, its decision to deny Plaintiff's claim for benefits was arbitrary and capricious.  *Id*. at 16 (citing *Wilson v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses, Walgreen Co.*, 942 F. Supp. 2d 1213 (M.D. Fla. 2013); *Epolito v. Prudential Ins. Co. of Am.*, 523 F. Supp. 2d 1329 (M.D. Fla. 2007)).

A plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), or "simply ignore[ ] relevant medical evidence in order to arrive at the conclusion it desire[s]," *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1199 (11th Cir.), *vacated in part on other grounds,* 506 F.3d 1316 (11th Cir. 2007).

The letter denying Plaintiff's claim for benefits and the letter affirming that denial belie Plaintiff's argument that Defendant ignored or arbitrarily refused to credit reliable evidence.

Specifically, in each letter, Defendant listed the information it considered in reaching its determination and provided a summary of some of that evidence.  R. 70-72, 135-38.  Plaintiff, however, claims that Defendant's failure to mention certain evidence that, according to Plaintiff, tends to support her claim for disability demonstrates that Defendant conducted a selective review of the record in order to arrive at the conclusion it desired.  Doc. 23 at 13-16.  For example, Plaintiff contends that Defendant's discussion of Dr. Varipapa's April 12, 2016 treatment note omitted, among other things, Plaintiff's report of "extreme" back pain and her report that sitting, standing, and ice aggravated her back pain.  Doc. 23 at 14 (citing R. 336).  The undersigned is not persuaded that Defendant's failure to mention such details demonstrates that it ignored or arbitrarily refused to credit reliable evidence.

A recent unpublished decision from the Eleventh Circuit, *O'Leary v. Aetna Life Ins. Co.*, 2018 WL 4697141 (11th Cir. Oct. 1, 2018), is instructive.  In that case, the plaintiff appealed the defendant's termination of his LTD benefits.  *Id*. at *2.  On appeal, the plaintiff argued that it was unreasonable for the defendant to terminate the plaintiff's benefits because the defendant failed to consider the Massachusetts's state Medicaid administrator's (MassHealth) determination that the plaintiff was disabled.  *Id*. at *3.  The Eleventh Circuit noted that while the defendant's decision affirming the termination of the plaintiff's benefits did not mention that MassHealth found the plaintiff disabled, the defendant did state that it considered "every piece of information" in the plaintiff's file, which included MassHealth's disability determination.  *Id*.  Thus, based on the defendant's statement and the presence of MassHealth's disability determination in the record before the defendant, the Eleventh Circuit found that "the substance of [the defendant's] decision confirms that it considered the records that were before MassHealth[.]"  *Id*.  Therefore, the

Eleventh Circuit rejected the plaintiff's argument that the defendant failed to consider MassHealth's disability determination. *Id*.

In this case, like the situation in *O'Leary*, Defendant did not mention much of the specific information contained in the medical evidence of record, including evidence that Plaintiff contends supports her claim for benefits. The letter denying Plaintiff's claim for benefits and the letter affirming that denial, however, listed all the information the Defendant considered in reaching its decision. R. 70, 135-16. When viewed together, the lists appear to account for practically all the evidence submitted in support of Plaintiff's claim for benefits. *Id*.[16] Indeed, Plaintiff does not contend that the lists failed to account for any specific evidence that she submitted in support of her claim for benefits. Thus, the letter denying Plaintiff's claim for benefits and the letter affirming that denial, like the defendant's decision in *O'Leary*, demonstrate that Defendant conducted a full review of the record in reaching its decision. Therefore, the undersigned finds that Defendant's failure to mention certain evidence does not demonstrate that it failed to consider that same evidence in reaching its decision. *See O'Leary*, 2018 WL 4697141, at *3.

In addition to identifying the evidence that it considered, Defendant also summarized much of the evidence. Specifically, Defendant summarized Plaintiff's subjective complaints, including Plaintiff's reports of neck, back, and leg pain, and the objective evidence contained within the medical records. It is reasonable to expect that Defendant's summaries would not mention every piece of information contained in each medical record. Indeed, Plaintiff has not cited any authority requiring a plan administrator to include a detailed recitation of the evidence it considered in

---

[16] As discussed later in this report, Defendant did not mention Dr. Kogan's report and opinion in the letter affirming the denial of Plaintiff's claim for benefits. R. 70. That appears to be the only piece of evidence that Defendant did not consider. To the extent Defendant did not consider Dr. Kogan's report, the undersigned finds that any error would be harmless since Dr. Kogan opined that Plaintiff had "no restrictions or limitations due to a neurological condition." R. 106.

reaching its determination.  *See* Doc. 23 at 13-16.  Thus, absent any authority to the contrary, the undersigned finds Defendant's summaries, which, contrary to Plaintiff's arguments, do mention evidence that would tend to support her claim for disability, such as her reports of pain and the observation of "diffuse myofascial tenderness and multiple tender points," R. 71, 136-38, demonstrate that Defendant did not engage in a selective review of the record.

Further, the decisions Plaintiff cites to – *Wilson* and *Epolito* – are distinguishable from this case.  In each of those cases, the court essentially found that the plan administrator "cherry-picked" evidence that supported its desired outcome while ignoring evidence that supported the plaintiffs' claims for disability.  *Wilson*, 942 F. Supp. 2d at 1251-52; *Epolito*, 523 F. Supp. 2d at 1342-43.  As a result of the selective reviews, and for other reasons, the courts in *Wilson* and *Epolito* found the denial of benefits arbitrary and capricious.  *Wilson*, 942 F. Supp. 2d at 1252-53; *Epolito*, 523 F. Supp. 2d at 1343.  Unlike the situations in *Wilson* and *Epolito*, the letter denying Plaintiff's claim for benefits and the letter affirming that denial refer to and demonstrate that Defendant considered all the evidence that Plaintiff submitted in support of her claim for benefits.  R. 70-72, 135-39.  Thus, the undersigned finds that *Wilson* and *Epolito* are distinguishable.

In summary, Plaintiff has not demonstrated that Defendant engaged in a selective review to reach the conclusion it desired.  Instead, the letter denying Plaintiff's claim for benefits and the letter affirming that denial demonstrate that Defendant considered practically all the evidence submitted in support of Plaintiff's claim for benefits, including evidence that tends to support Plaintiff's claim of disability.  Therefore, the undersigned finds that Defendant did not engaged in a selective review by ignoring or arbitrarily refusing to credit reliable evidence.

**2.  It was Not Unreasonable for Defendant to Rely on Dr. Ash's Report and Opinions**

Plaintiff claims that it was unreasonable for Defendant to rely on Drs. Kogan's and Ash's reports and opinions, because their opinions were "to far afield of the medical evidence of record to be considered reliable" and they failed to consider the impact of Plaintiff's medication side-effects.  Doc. 23 at 16-18.

A plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker*, 538 U.S. at 834.  That said, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id*.

First, as discussed earlier in this report, Defendant did not mention Dr. Kogan's report in its letter affirming the denial of Plaintiff's claim for benefits. *See supra* p. 29 n.17.  Thus, given Defendant's silence with respect to Dr. Kogan, it appears that Defendant did not rely on Dr. Kogan's report and opinion in affirming the denial of Plaintiff's claim for benefits.  This omission seems reasonable given Dr. Kogan's belief that fibromyalgia is Plaintiff's primary diagnosis, which should be addressed by a rheumatologist, and his opinion that Plaintiff had "no restrictions or limitations due to a neurological condition." R. 106-07.  Therefore, since it appears that Defendant did not rely on Dr. Kogan's report and opinion, it cannot be said that Defendant's decision was unreasonable on account of Dr. Kogan's report and opinion.

Second, it was not unreasonable for Defendant to rely on Dr. Ash's report.  A review of the longitudinal record seemingly demonstrates that the much of Plaintiff's complaints of pain related to her fibromyalgia.  Thus, Defendant retained Dr. Ash, a rheumatologist, to review the medical evidence submitted in support of Plaintiff's claim for benefits.  Dr. Ash's report contains

a relatively thorough summary of the evidence of record, an analysis of that evidence, and her opinion outlining Plaintiff's functional limitations.  R. 85-96.  Plaintiff, however, argues that Dr. Ash's opinion – particularly her opinion that Plaintiff could sit for eight-hours per day with five-minute breaks every two hours – is inconsistent with Plaintiff's treating physicians' opinions that Plaintiff cannot sit for prolonged periods.  Doc. 23 at 17-18.[17]   Indeed, Dr. Ash's opinion concerning Plaintiff's ability to sit is inconsistent with Plaintiff's treating physicians' opinions. However, the undersigned cannot say that it was unreasonable for Defendant to rely on Dr. Ash's opinions over those of Plaintiff's treating physicians.

Unlike Plaintiff's treating physicians, Dr. Ash had the benefit of reviewing all the medical evidence submitted in support of Plaintiff's claim for benefits, including Plaintiff's treating physicians' opinions.  R. 85-87.  Dr. Ash then analyzed the evidence and identified the evidence that supported the existence of functional limitations.  R. 92-94.  For example, in discussing evidence related to Plaintiff's fibromyalgia, Dr. Ash found that Plaintiff's fibromyalgia supported some functional limitations, which she articulated later in her report, but, given Plaintiff's improvement on Cymbalta, Dr. Ash found that Plaintiff's fibromyalgia did not support a "total loss of function."  R. 93.

Comparatively, the treating physicians' opinions are relatively devoid of any explanation about how the medical evidence (e.g., diagnostic tests and examination findings) supported their opinions.  Indeed, Defendant took note of this with respect to Dr. Swaminathan's October 19, 2016 opinion, in which Dr. Swaminathan opined, in relevant part, that Plaintiff can sit for no more than

---

[17] Plaintiff does not challenge any other aspect of Dr. Ash's opinion.  *See* Doc. 23 at 17-18.  Thus, Plaintiff has effectively waived any challenge to the reasonableness of the other parts of Dr. Ash's opinions, such as Dr. Ash's opinions concerning the amount of weight Plaintiff could lift and the amount of time she can stand or walk during the day.

one and a half hours in an eight-hour workday.  R. 260.  Dr. Swaminathan, however, provided

absolutely no explanation about how the medical evidence (e.g., diagnostic tests and examination

findings) supported his opinion.  *Id*.  Thus, Defendant sent Dr. Swaminathan a letter explaining

that the medical evidence did not seem to support his opinion and, as a result, asked him to either

sign the letter if he agreed with Defendant's evaluation of the evidence, or, if he disagreed, to send

a response "with symptoms, physical exam findings, and diagnostic tests to support any restrictions

. . . and limitations" that Plaintiff has because of her impairments.  R. 411.  Dr. Swaminathan,

however, did not respond to the letter.  Therefore, Defendant was left to consider a conclusory

opinion.  Likewise, while the opinions that followed Dr. Swaminathan's October 19, 2016 opinion

contained more detailed limitations, they too contained little explanation about how the medical

evidence (e.g., diagnostic tests and examination findings) supported their opinions.  For example,

Drs. Amado and Kirk seemingly pointed to "MRI[s]" and "EMG/NCS" as support for their

opinions concerning Plaintiff's limitations.  R. 120, 153.  However, they do not explain which of

the many MRIs or the EMG studies, some of which were normal, supported their opinions or why

those studies supported their opinions.  *See id*.  The lack of explanation can reasonably be viewed

as undermining the reliability of their opinions.  *See Gipson v. Administrative Comm. of Delta Air

Lines, Inc.*, 350 F. App'x 389, 395 (11th Cir. 2009) (noting that treating physician's opinion was

conclusory and failed to provide any basis for the decision that the plaintiff was unable to work).

Further, the treating physicians' opinions contained some inconsistencies with their own treatment

records.  For example, Dr. Kirk completed a fibromyalgia medical evaluation form in which she

stated that Plaintiff exhibited several "positive objective signs" of her impairments, including

spasms, muscle weakness, and tenderness.  R. 153.  However, all of Dr. Kirk's physical

examinations were unremarkable.  R. 208, 534, 536, 538.

A plan administrator is not categorically required to accept the opinions of the claimant's treating physicians over those of independent medical professionals who have reviewed the claimant's file but have not directly observed the claimant. *See Blankenship*, 644 F.3d at 1356. Bearing this in mind and considering the scope and detail of Dr. Ash's opinion compared to the conclusory and, at times, inconsistent nature of Plaintiff's treating physicians' opinions, the undersigned finds that it was not unreasonable for Defendant to rely on Dr. Ash's opinions over those of Plaintiff's treating physicians. *See Smith v. Cox Enter., Inc.*, 81 F. Supp. 3d 1366, 1385-86 (N.D. Ga. 2015) (finding defendant's decision to not credit treating physician's opinion was reasonable because the opinion was not supported by "objectively substantiating assessments" and was contradicted by the physician's own accounts of plaintiff's condition).

Third and finally, Dr. Ash's report was not unreliable due to her failure to consider the side effects of Plaintiff's medications. Plaintiff claims that Dr. Ash's failure to mention the medication side effects – drowsiness, dizziness, and impaired thinking – noted in Dr. Amado's and Ms. Lemoi's fibromyalgia medical evaluation forms demonstrates that Dr. Ash did not consider those side effects and, thus, her report and opinion is unreliable. Doc. 23 at 18 (citing R. 122, 146). While Dr. Ash did not expressly mention the medication side effects noted in Dr. Amado's and Ms. Lemoi's fibromyalgia medical evaluation forms, a review of Dr. Ash's report shows that she considered those fibromyalgia medical evaluation forms. R. 86. Thus, the fact that Dr. Ash did not expressly discuss those side effects does not necessarily mean that she did not consider those side effects in rendering her opinion. *See O'Leary*, 2018 WL 4697141, at *3. Further, the undersigned notes that Dr. Amado's and Ms. Lemoi's report of medication side effects in the fibromyalgia medical evaluation forms is not supported by their own treatment records, which do not contain any complaints or observations of drowsiness, dizziness, or impaired thinking. R. 163-

66, 175-177, 350-53.  In light of the foregoing, the undersigned finds that Dr. Ash's failure to expressly mention the medication side effects noted in Dr. Amado's and Ms. Lemoi's fibromyalgia medical evaluation forms did not render Dr. Ash's opinion unreliable.

In summary, the undersigned finds that it was reasonable for Defendant to rely on Dr. Ash's opinion over those of Plaintiff's treating physicians.

### 3.   Defendant was Not Required to Obtain a Vocational Analysis

Plaintiff suggests that the occupational analysis that Defendant obtained was insufficient to determine whether Plaintiff can perform her "regular occupation." Doc. 23 at 18.  Thus, Plaintiff claims that the occupational analysis was insufficient to determine whether she is disabled under the Plan.  *Id.*  Instead, Plaintiff contends that Defendant should have obtained a vocational analysis. *Id.*  Absent such evidence, Plaintiff essentially argues that Defendant's decision to deny Plaintiff's claim for benefits was arbitrary and capricious.  *Id.*

The Plan states that an individual will be found disabled if an injury or sickness causes her to experience a "significant change in [her] mental or physical functional capacity" so that she is "prevented from performing at least one of the Material Duties of [her] Regular Occupation on a part-time or full time basis[.]"  R. 47.  The Plan defines "regular occupation" as not being limited to an individual's specific position she held with the policyholder, but "a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT)."  R. 49.  Thus, to determine an individual's "regular occupation," the plan administrator will look to the individual's "occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region."  *Id.*

Here, Defendant retained a vocational and rehabilitation specialist to provide an occupational analysis of Plaintiff's job at MMFE. R. 379. The vocational and rehabilitation specialist opined that Plaintiff's job at MMFE was comparable to that of a Mechanical-Design Engineer, Products in the DOT and then identified the functional requirements of that job. *Id*. Defendant considered this information in reviewing Plaintiff's claim for benefits and, based the occupational analysis, found that despite Plaintiff's credible limitations she is nevertheless able to perform the material duties of a Mechanical-Design Engineer, Products. R. 70, 72, 136, 138. The occupational analysis was sufficient to satisfy Defendant's obligation under the Plan to identify Plaintiff's "regular occupation," i.e., Mechanical-Design Engineer, Products, and determine whether Plaintiff could perform the material duties of that job as it is normally performed in the national economy. Indeed, Plaintiff does not contend that Defendant failed to satisfy its obligations under the Plan or that the Plan required Defendant to obtain any additional information, such as a vocational analysis. *See* Doc. 23 at 18. Instead, Plaintiff simply argues that Defendant should have also obtained a vocational analysis. *Id*. Plaintiff, however, cites no authority in support of this argument nor has she provided any persuasive argument demonstrating that a vocational analysis was necessary under the circumstances of this case. *Id*. Considering the plain language of the Plan and the absence of any authority to the contrary, the undersigned finds Plaintiff's argument unpersuasive. Therefore, the undersigned finds Defendant's reliance on the occupational analysis in adjudicating Plaintiff's claim for benefits was reasonable.

### B. There is a Conflict of Interest, but it does Not Render the Denial of Benefits Arbitrary and Capricious

Plaintiff argues that Defendant's decision is unreasonable because it is tainted by: 1) Defendant's structural conflict of interest; and 2) the "aggressive" manner in which Defendant denied Plaintiff's claim for benefits. Docs. 23 at 13; 26 at 6-7.

There appears to be no dispute that Defendant operates under a conflict of interest. "When the administrator makes eligibility decisions and pays benefits, a structural conflict of interest exists[.]" *Howard v. Hartford Life & Acc. Ins. Co.*, 563 F. App'x 658, 663 (11th Cir. 2014). Here, Defendant both evaluates claims and, if it approves the claim, it pays the benefits. *See* Doc. 27 at ¶ 1. Thus, the undersigned finds that Defendant operated under a structural conflict of interest when it reviewed and denied Plaintiff's claim for benefits.

The plaintiff maintains the burden through step six of the ERISA analysis to prove that the plan administrator's decision is arbitrary and capricious. *Blankenship*, 644 F.3d at 1355. Thus, the plan administrator is not required to prove its decision was not tainted by self-interest. *Id*. A structural conflict of interest is "a factor" in the analysis, "but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." *Id*. "The presence of a structural conflict of interest – an unremarkable fact in today's marketplace – constitutes no license, in itself, for a court" to overturn an otherwise reasonable benefits decision. *Id*. at 1356.

Plaintiff notes the existence of Defendant's structural conflict of interest but provides absolutely no argument nor does she point to any evidence demonstrating how the structural conflict of interest influenced Defendant's resolution of her claim for benefits. *See* Docs. 23 at 13; 26 at 6-7. Thus, Plaintiff has failed to satisfy her burden of demonstrating that Defendant's decision was unreasonably tainted by its structural conflict of interest. Further, notwithstanding Plaintiff's failure to satisfy her burden, Ms. Pellet's uncontroverted declaration establishes that Defendant's claims decisions are based upon a review of the record and not influenced by any financial incentive. Doc. 22-1. Therefore, the undersigned finds that Plaintiff has failed to demonstrate that Defendant's structural conflict of interest unreasonably tainted Defendant's

otherwise reasonable decision to deny Plaintiff's claim for benefits. *See Echols v. Bellsouth Telecomms., Inc.*, 385 F. App'x 959, 961 (11th Cir. 2010) ("[G]iven the eminent reasonableness of the decision, the lack of evidence that any assumed conflict influenced the claims decision indicates that any assumed conflict should be given little weight in judging whether the decision was an abuse of discretion.").

Similarly, Plaintiff has failed to demonstrate that the allegedly "aggressive" manner in which Defendant denied Plaintiff's claim for benefits caused Defendant's decision to be unreasonable. In support of her allegation that Defendant aggressively denied Plaintiff's claim for benefits, Plaintiff relies solely on her previous arguments challenging the reasonableness of Defendant's decision, i.e., Defendant impermissibly cherry-picked evidence that supported denial, Defendant erroneously relied on Drs. Kogan's and Ash's opinions, and Defendant failed to obtain a vocational analysis. Doc. 26 at 7. Plaintiff claims that these issues are "inconsistent with the behavior of a neutral claims arbiter and impl[y] that the Defendant was not seeking to achieve a fair determination on the Plaintiff's claim for benefits." *Id*. The undersigned disagrees for two principle reasons. First, the undersigned has previously found none of the issues Plaintiff identified caused Defendant's decision to be unreasonable. *See supra* pp. 24-37. Thus, for that reason alone, Plaintiff's argument is due to be rejected. Second, Plaintiff's argument overlooks Defendant's attempts to review Plaintiff's claims, such as its letter to Dr. Swaminathan, which provided him an opportunity to submit additional explanations or evidence in support of his opinions concerning Plaintiff's limitations, and Defendant's retention of Drs. Kogan and Ash. Contrary to Plaintiff's argument, these actions tend to demonstrate that Defendant made a reasonable effort to understand Plaintiff's impairments and the impact those impairments had on her ability to perform her regular occupation. Therefore, the undersigned finds that Plaintiff has

failed to demonstrate that the manner in which Defendant reviewed Plaintiff's claim for benefits establishes that Defendant's decision was unreasonable.

In light of the foregoing, the undersigned concludes that Defendant's decision to deny Plaintiff's claim for benefits was not arbitrary and capricious.  Therefore, the undersigned finds that Defendant is entitled to summary judgment.

## IV.   Conclusion

Accordingly, it is respectfully **RECOMMENDED** that:

1.  Defendant's motion for summary judgment (Doc. 22) be **GRANTED**

2.  Plaintiff's motion for summary judgment (Doc. 23) be **DENIED**; and

3.  The Clerk be directed to enter judgment in favor of Defendant and against Plaintiff, and to close the case.

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on January 14, 2019.

DANIEL C. IRICK
UNITES STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Courtroom Deputy